right away. In Connecticut Children's Medical Center, the Continental Casualty Company, 22322. Good morning, Your Honor. I represent Connecticut Children's Medical Center, Children's Hospital, with Since the district court granted the insurer's motion to dismiss, the Connecticut Supreme Court, as you know, has spoken to issues related to business interruption losses arising out of COVID-19. The Connecticut, and that was in the Connecticut Dermatology case. The Connecticut Supreme Court stated that, and I quote, in ordinary usage, the phrase direct physical loss of clearly and unambiguously means that there must be physical alteration to or deprivation of the property that renders it physically unusable or inaccessible. The Connecticut Supreme Court went on to hold that there was no coverage in that case, that's the Connecticut Dermatology case, as there had been no physical transformation in its view with regard to the property. In that case, there was no claim for the presence of the virus within the properties. No, but it did go on to say, counsel, that even if the plaintiffs had claimed that their properties were actually contaminated by the coronavirus, we find persuasive the cases that have held that the virus is not the type of physical contaminant that creates the risk of a direct physical loss. Because once a contaminated surface is cleaned or simply left alone, it no longer poses any physical threat to occupants. That's correct, Your Honor. So doesn't that foreclose this argument? No, Your Honor, because in the case below, no claim was made as to physical alteration of the air. In Connecticut, there's a Connecticut general statute. So if we were to certify this question, do you think that the answer would come back differently? Yes, I do, Your Honor. You do? I do, and I think we can find the clue to that in the cases contained within Connecticut dermatology. So you think that they would say we are wrong when we said in Connecticut dermatology, even if the plaintiffs had claimed and on and on? Your Honor, for example, if I could, it cited... No, no, no. Please answer my question. They would not have to say they were wrong. It would be consistent with what they said in the decision itself, because in the decision itself, it noted that you could have a loss without tangible alteration to the property itself, to the structure. And it cited to such things as E. coli, bacteria, ammonia, friable asbestos. It cited to Kim Gee case, which in turn found that you could have a transformation and a loss of the property without structural damage. And it set up... Wasn't there a distinction, though, because once one decontaminated for COVID, it was then usable? Isn't that like a primary distinction between this and some of the other stuff that you mentioned? Well, it... It's not permanent. It may not be permanent in a restaurant. It may not be permanent in a retail store. But in a hospital treating COVID-19 patients who are residential in nature, you have an ongoing contamination taking place. And you have an ongoing contamination... Patients that are there, an ongoing need to take measures and address them. Would the flu present a claim under this policy? No, Your Honor. And what's the distinction? We have not seen in this world or society anything like the COVID-19 pandemic since the Spanish flu. The flu itself is something we deal with day in, day out, year round. That's not the unique situation presented by the... So it's the degree of contamination? What's the distinction? It's the degree of contagiousness of the virus, Your Honor, that affects patients and therefore creates risks that are extreme in this setting ambientally. Because of the residential nature of the patients who are creating those risks, you have ongoing contamination into the air. Well, I feel like this is kind of collapsing onto your air argument, which I must confess I find a little overstating of what the law is. My understanding is that real poverty includes spaces that may be filled with air, not the actual air. And so that means that assuming even if we were going to, that the hospital was part of the covered property, don't we foreclose that? Because this is not persistent, because it can be decaminated in a number of ways. It can be cleaned. And that would... The fact that the air can be cleaned and the fact that the surface area can be cleaned, I think, squarely puts it in within Connecticut dermatology. Your Honor, with all due respect, the Connecticut General Statute that includes air as part of the real property, and it's a real property aspect of it... Right, so that's the spaces that may be filled with air, which I think is part of the argument you were making earlier. And water. And the CNA policy excludes water but does not exclude air. And I also want to make this point before my time runs out. Capstone, Your Honor, defines property damage specifically as related to the structures. The CNA policy did not. It defined the insured covered property as real property consistent with the Connecticut General Statute, which in turn includes air as part of the real property. You've reserved, I see... One and a half. One and a half minutes of rebuttal. I've not seen that in my time as judge, but you're welcome to do... I did this the last time I was here, Your Honor, and I had some trouble getting there, but I got there. All right, we'll hear you in eight minutes. Yes, thank you, Your Honor. Or less. Good morning. Thank you, Judge Leahy, Cannon, Shanmugam, and Paul Weiss for Appley's Continental Casualty and CNA. May it please the Court. This case presents the now familiar question of whether claims seeking to recover business losses from the stay-at-home orders issued in the wake of COVID-19 fall within the scope of provisions commonly found in property insurance policies. I really just want to make a couple of points this morning in discussing this case. In defense of the district court's decision, which we believe was correct. First, with regard to the business interruption and extra expense claims, it is now clear in the wake of Connecticut Dermatology Group that Connecticut Children's failed to allege physical loss of or damage to property. And really, the only argument that Connecticut Children's is making now in an effort to distinguish Connecticut Dermatology is the argument that we heard from my friend, Mr. Danaher, this morning. Namely, the argument that this case is somehow different because there were allegations of the presence of the COVID-19 virus. Well, but don't they also have the disease contamination provision? They do, and I'd be happy to turn to that as well. Okay, just that's an important difference, I think. Yes, and I would certainly acknowledge that that provision is not controlled by Connecticut Dermatology Group. And I will, I'm happy to turn to that language now or to turn to it later, whatever you would prefer. You're here, why not? Well, let me go right to it since you asked about it. With regard to the disease contamination claim, our fundamental submission is simply that Connecticut Children's failed to allege that it was ordered to evacuate or decontaminate the locations. And again, the language of the provision says that the order must constitute an evacuation or decontamination order at a covered location. Now, the orders issued by Governor Lamont are found in the joint appendix at pages 169 to 174. And none of those orders even mentions evacuation or decontamination, much less mandated at the specific locations belonging to Connecticut Children's. Could I ask you, counsel, about that second factor, which you just delineated, which was one of the two grounds upon which the district court concluded. Depends a little bit on what the meaning of at is. It seems to me that there's at least some ambiguity on that factor as to whether we're talking about directed at a specific location, or couldn't it also be applicable at a given location? And if it could sustain the meaning of the latter, then could you continue to rely on that aspect of the district court's decision? So, as you say, Judge Nathan, Judge Meyer's decision rested on both of those grounds. And I'd really be content to rest on and stop on the first one, which is that you do have to have an evacuation or decontamination order. And in our view, consistent with all of the courts of which we are aware that have addressed the issue, that really requires an order requiring evacuation or decontamination, which is to say mere guidance as to what you might do, what might be best practices would be insufficient. I'm just feeling like we're being a little bit circular, and we want to get this right. So part of the reason why Connecticut dermatology applies is because it can be decontaminated. And so now we're saying that it either needs to have a mandatory evacuation or a decontamination. And I'm wondering if you can, what happens if we believe that the language is ambiguous as to whether or not there needs to be a governmental order mandating an evacuation? How does that change your position? I think at that point, I would have to just respectfully disagree. And I do think that the courts that have considered this issue have said that the language or materially identical language is unambiguous. We obviously point to the Fifth Circuit's decision in the PS business management case. There are also district court decisions to the same circuit. But it doesn't have the same language as PS business. The language is slightly different, I would grant you. But I think it is materially identical because, again, for something to be in order. Wait a minute, if the language is different, how can it be? Okay, go ahead. Well, I think it has the same meaning, even though I would acknowledge that the language is different. And that's for the simple reason that we think that the plain meaning of order is something that requires or mandates taking a particular action. Now, to finish my answer to Judge Nathan on the second part of this, I do think that the better reading of the provision is that the order has to be directed to the location. And I would note that the policy contains a very specific definition of location. It's at Joint Appendix 73. It's, quote, the area within legal boundaries of the premises or of the portion of the premises in which the insured has an interest. Yeah, although I'm not sure that, again, if you accept, and maybe you don't, but if you accept that the meaning here could be either directed at or applicable at, the definition of location I don't think changes that potential meaning. And I think I would acknowledge that if you had an order sent from Governor Lamont saying, you know, every hospital in, say, New Haven, Connecticut must be evacuated, that there could be an argument that that qualifies. In other words, the mere fact that it isn't an order directed solely at one hospital may not be of any moment. But really, the critical takeaway here, and I would urge the Court to look at these orders, is that these orders come nowhere near directing the evacuation or decontamination of hospitals. All the orders. Go ahead. All I was going to say is that all the orders say is that the hospitals are, in fact, essential facilities. And while the hospitals may have engaged in cleaning and other activities, and I'm not sure that that would even rise to the level of decontamination, it didn't do so in the face of a government order. And that's really the critical point, and, again, the point that every court that has considered a disease contamination provision has accepted. Well, you're asking us to look at both the orders and the allegations here, correct? Correct. I don't think the allegations really say anything beyond the orders and the orders were attached. Certainly, in this case, there's not only the complaint, there's also the Rule 56A1 statement that was submitted by Connecticut Children's in support of its motion for partial summary judgment. And neither the orders from Governor Lamont nor the guidance from the CDC or other public health authorities, again, requires evacuation or decontamination. And the last thing I would say with regard to the business interruption or extra expense claims is simply that to the extent that Connecticut Children's' argument here turns simply on the allegation of presence of the COVID-19 virus for the reasons that Judge Nathan indicated in her colloquy with my friend Mr. Danaher, I do think that the Connecticut Dermatology Group decision contemplated this argument and really rejected it and it made clear. Do you think there's any limit to that or do you think that case would cut off all claims of physical damage to property based on COVID-19 or is there any set of allegations or record facts that could allow a basis for distinction? I'm not aware of one in the cases that we have seen and I think that that's for the simple reason that in that paragraph that you were quoting from, I think that the court made quite clear that the allegation of mere presence is not enough in and of itself. The presence has to cause the loss as defined by the Connecticut Supreme Court in the decision. And so, you know, is there a possibility in which the presence of some virus could cause a loss perhaps, but again in the context of COVID-19 because of the nature of the COVID-19 virus and as the Connecticut Supreme Court said, what is distinctive about this virus is that it is essentially evanescent, that it exists on surfaces for some period of time and then goes away. It can be removed through simple cleaning. You know, those are features of COVID-19 that other contaminants such as mold and others do not necessarily share. Just a quick question. Are you aware of any real-life examples with respect to the direct disease contamination coverage where a hospital received insurance pursuant to that type of coverage? I'm not aware of sort of the complete set of circumstances under which claims have been sustained under that provision, but I think an example might be something like, say, Legionnaires' disease, which is the sort of paradigmatic example of a situation where there could easily be a public health order to essentially, you know, shut down the facility to take steps to decontaminate, which as I understand it would require, you know, changes to the ventilation system and so forth. Can I ask, like, what are we supposed to make of 2B that doesn't include the, I'm sorry, and the disease contamination coverage that doesn't include the if required by the governmental authority when 2A does? What's the negative influence there? I mean, it would seem to me if they were both if required by the government authority, they would have either not put it at all in A or put it in A and B, but maybe something is different about a decontamination. And, again, my trouble is that if we're arguing that the reason that the loss is not permanent is because it can be decontaminated, then doesn't that, you know, it seems to be, explain to me why you don't want it both ways. Well, sure. So just to be clear, we're looking at the language on Joint Appendix 84 in the disease contamination provision, and as I read that language, the evacuation or decontamination order is, you know, kind of the conditioned precedent at the beginning of the provision. So, in other words, if you look at the language at the beginning of A, if as a result of an evacuation or decontamination, the following steps are taken. Well, that would make sense, except for they felt the need to add it again in A, and they didn't add it in B, and we're supposed to construe things against the insurer. I'm just wondering, doesn't B require the applicability of A? Yes. Well, it requires the condition at the beginning of the first A to be satisfied. And I would note, Judge Perez, I think the explanation for the if required by the governmental authority at the end of A to A is simply that the evacuation itself has to be commanded by the order. So, in other words, if you had a decontamination order rather than an evacuation order and then you evacuated, then you would not be in. I'm sorry, explain. The decontamination order doesn't have to be required? No, there would still have to be an evacuation or decontamination order regardless, because that's necessary in order to trigger the entire provision. My point was simply that to the extent that you were trying to recover under A to A for evacuation. What about A to B? What about A to B? That's what we're focusing on. Well, you would be able to recover for decontamination or disposal if there is an evacuation or decontamination order. So that's, I think, the difference. But I think everyone recognizes that you have to have that for any of this provision to apply. That's the overarching condition. Correct. So, in other words, that limitation in essence says you can recover for evacuation, but only if evacuation itself is ordered. Thank you very much. Great. Thank you, Your Honors. Counsel, you've got your minute and a half. I'd like to return to the issue of damage to the air, alteration of the air in absence of structural damage, and refer to the Connecticut Dermatology case where it cites Chem-C, and it specifically says that it recognizes that unlike cases of gasoline infiltration, cat urine, odor it means, lead dust, and other noxious substances the courts have found to constitute direct physical losses, there is no allegation of persistent contamination here. It is recognizing that it sees a distinction between a situation where there is persistent contamination of a structure and such types of contamination as are found enlisted in Chem-C. But it's distinguishing COVID-19, so I'm confounded by your... Well, what I was asked earlier was whether or not the Connecticut Supreme Court would take a look at this case and find in favor of our argument on alteration of the air, and I give that to you in response to that. Second thing with regard to the order regarding decontamination, there is a standing order. It's found in OSHA in the General Duty Clause, Section 5A1, which means, for example, Connecticut Children's Medical Center must provide a safe environment for its employees. Otherwise, it runs risk for fines under OSHA. Did you make this argument? We did. Okay. It's actually alleged in the complaint you're on. But you're saying that's a standing order unrelated to COVID. Yes. So no matter what, you've got a claim for any compliance with that order? No. It would be a decontamination issue, what I'm talking about. Good. Okay. Thank you very much. That concludes this argument calendar, and I'll ask the courtroom deputy to adjourn the court. Thank you. The court stands at recess. Thank you. Very nice job. Interesting. They seem to take it in stride. I think he remembers. He gave me a hard time. Back off. Well, I know you're going to have to call me off. Well, I get that. Thank you. Thank you. Thank you. Thank you.  Yes. Thank you.  Thank you. I'm assuming from the calendar that the first two were being argued together, and then the second 10 minutes on the third appeal? Correct. So the first two 10 minutes total, and then the next 20 minutes. Okay. Thank you.